HESSER-MILTON-RENAHAN COAL COMPANY, Appellant, vs. LA CROSSE FUEL COMPANY, Respondent.

*May 14—June 19, 1902.*

*Contracts: Construction: Acquired meaning of words: Trade usage: Evidence: Bill of particulars.*

1. A contract made by letters and telegrams between wholesale coal dealers and a retailer is construed to be an absolute contract to deliver as much as two car loads of coal per week, subject only to strikes, and a scarcity of cars is *held* to constitute no excuse for a breach.

2. The words "subject to strikes," in a written contract to deliver coal, may be shown by parol evidence to have acquired, by general usage in the coal trade, a definite meaning which would include a strike limited to the vendor's mines, as well as a general strike in all mines.

3. A bill of particulars served in response to a demand, but not identified or verified as correct by any witness, does not constitute affirmative proof of any fact, as against the opposite party.

APPEAL from a judgment of the circuit court for La Crosse county: J. J. FRUIT, Circuit Judge. *Reversed.*

This is an action to recover a balance of $502.21 due for coal furnished and delivered to defendant between July 1, 1899, and March 31, 1900. The coal was sold and delivered by the firm of Hesser & Milton, who were wholesale coal dealers at Cincinnati, and operated mines in the New River

district in West Virginia on the line of the Chesapeake & Ohio Railway. June 1, 1900, the plaintiff corporation was formed by Hesser and Milton, and all the firm assets, including the claim sued on, were transferred to the corporation. The defendant is a domestic corporation engaged in the retail coal business at La Crosse. The defendant, by answer, admitted the plaintiff's claim, but pleaded a counterclaim, by which it was alleged that on or about September 29, 1899, it contracted with the city of La Crosse to furnish said city during the ensuing year 3,000 tons of "mine run" coal, to be used at the city pumping station, and 500 tons of prepared coal, to be used in the city schools; and that on or about the same date, Hesser & Milton contracted to furnish defendant the coal to fill said contracts at certain prices, and to deliver the same from time to time as required; that Hesser & Milton failed to furnish said coal as required, and that defendant, in order to fulfill its said contracts, was obliged to buy coal elsewhere, and to expend in such purchases more than $1,000 in excess of the prices agreed upon in the contract with Hesser & Milton, for which sum, as well as for loss of profits, judgment was demanded. The plaintiff, by reply, admitted that Hesser & Milton contracted to furnish defendant a season's supply of coal, running to May 1, 1900, at certain prices, but denied that the contract was for any specific quantity, or that it guarantied delivery, but that the contract was made subject to strikes and other causes beyond their control, and that the failure to deliver as fast as ordered was due to impossibility of obtaining cars, and to a strike in their mines running from March 28 to April 21, 1900.

The action was tried by a jury, the defendant having the affirmative of the issue. The contract was made entirely by correspondence. A number of letters passed between the parties in August, 1899, by which it appears that the defendant informed Hesser & Milton of the city coal contracts aggregating about 3,000 tons, which would soon be let, and

of its desire to bid on the same and, if it secured the contracts, to fill them with Hesser & Milton coal. In this correspondence Hesser & Milton finally offered to protect a contract for 3,000 tons with the city for "mine run" coal for the year ending October 31, 1900, on basis of $3.60 per ton f. o. b. at La Crosse, till October 31, 1900, stipulating, however, that they did not guaranty the existing freight rate (which was $2.85 per ton), but that the defendant must see to that; thus making their guaranty 75 cents per ton at the mines. Following this correspondence, the defendant sent to Hesser & Milton the following telegram September 29, 1899: "Please hurry forward coal ordered. Bids for city supply open tomorrow. Can we guaranty shipments two cars per week for year mine run?" To this telegram Hesser & Milton replied on same day: "Will guaranty price of eighty cents at mines, and supply subject to strikes. You will have to see Northwestern for protection of freight rates." On the 6th of October following, the defendant contracted with the city to furnish 2,500 tons, more or less, of "mine run" coal for the year ending October 1, 1900, at $4.40 per ton, and also to furnish 500 tons of prepared coal for the schools at $5.40 per ton, and on the same day wrote Hesser & Milton as follows:

"Gentlemen: I have secured the contract for city pump works. Your wire 29th makes price 80 cents at mines for mine run. I understood from former correspondence that price would be 75 cents for mine run for year, and I based on this. Please advise if I am not correct. On this order I wish you would ship at earliest possible time ten cars mine run, and follow with two cars per week until further advised."

To this letter Hesser & Milton replied October 17, 1899, explaining why they felt compelled to ask 80 cents at the mines instead of 75 cents, and saying:

"We fully expect to protect you right up to the handle, as agreed, on this contract, and we will have to ask you to be entirely fair with us on shipments of mine run made you between now and May 1st, which will be delivered at the city pump works."

To this letter defendant replied October 19, 1899, as follows:

"Gentlemen: Your favor of the 17th at hand and noted. Your position taken on the city waterworks is all right. The summer price on coal is usually lower than during the winter months, therefore thought that there would be no objection to extend same to October. We will let it stand at 80c. for the pump works. The ten cars run of mine ordered the 6th, with two cars a week to follow, is for the city, and on this it is understood the price will be 80c."

On October 20, 1899, Hesser & Milton replied as follows:

"Beg to acknowledge receipt of your favor of the 19th inst. We are very glad, indeed, that you take a proper grasp of the situation. We note your prices on mine run, and will go ahead on shipments on basis of 80 cents per ton at the mines, which we take it will be entirely satisfactory."

It further appears that Hesser & Milton failed to ship coal as agreed on account of an alleged scarcity of cars, and much correspondence took place between the parties on the subject, the defendant urging that shipments must be made, and Hesser & Milton excusing the delay on account of inability to obtain cars. As the season progressed, the defendant, in order to fulfill its contract with the city for "mine run" coal for the pump works, was obliged to purchase of outside parties 1,682 tons at various times, upon which it was obliged to pay in excess of the price agreed to be paid to Hesser & Milton the sum of $1,009.80. It does not appear, however, when this excess was incurred or paid, but simply that this was the total amount of excess during the year. A strike occurred in Hesser & Milton's mines March 28, 1900, and continued till April 21st, during which time no coal could be mined or shipped. There were other mines in the New River district from which the same quality of coal could have been obtained.

The defendant waived any claim for an affirmative judgment for damages, and moved for a verdict in its favor, which was granted, and from judgment thereon the plaintiff appealed.

For the appellant the cause was submitted on the brief of *Mills Tourtellotte.*

*George H. Gordon,* for the respondent.

WINSLOW, J.   The claims of the appellant which are necessary to be considered are:   (1) That the contract which appears in the letters and telegrams was not an absolute contract to ship two car loads of coal per week, but only a contract to do their best in the usual course of business to fill orders, and that, if Hesser & Milton were prevented from shipping coal as ordered by reason of scarcity of cars or other cause beyond their control, there was no breach of the contract; (2) that the words "subject to strikes" in the telegram of September 29th were so far of an ambiguous or uncertain nature that parol evidence should have been received showing their generally accepted meaning in the coal trade.

1. As to the proper construction to be placed upon the contract, we think that the trial court was entirely right in construing it as an absolute contract to deliver as much as two car loads per week during the year "subject to strikes," and that the fact of a scarcity of cars constituted no excuse for the breach of the contract, no such exception to the absolute character of the undertaking having been embodied in the letters or telegrams.   The material part of the letters and telegrams will be found set forth in the statement of facts, and it does not seem necessary to repeat them here, nor to do anything more than state our conclusions on the subject.

2. It is elementary law that the construction of written contracts whose words are plain is the proper function of the court, but, if words or phrases are used therein which are technical, or have gained a definite and peculiar meaning in a certain trade by general usage, extrinsic evidence may be received, showing that such meaning has been acquired, and what it is.   2 Jones, Ev. §§ 461, 462.   The words "subject to strikes" cannot be said to be entirely definite in their

meaning. There may be a general strike in all the mines in the country, or there may be a strike confined to the plaintiff's mines alone, or to the mines in a certain district alone; or there may be a strike upon the railroad lines interrupting all traffic. Any of the strikes supposed might seriously interfere with the carrying out of the contract to deliver coal. It is evident that, if the words here used were intended to refer to a general strike in all the coal mines of the country or in all the mines of the New River district, the plaintiff showed nothing in the way of a defense to the counterclaim; but if the words, by general usage and custom among coal dealers, meant a strike in Hesser & Milton's own mines alone, then the undisputed fact that there was a strike in their mines for nearly a month in March and April, 1900, would operate as a defense to the counterclaim so far as it is based upon any default occurring during that time. The appellant called witnesses who were experienced in the coal trade, and attempted to show by them the construction which the words "subject to strikes" had acquired by general usage and custom in the coal trade, and the evidence was excluded. The purpose of the evidence so offered was evidently to show that the clause was satisfied by the happening of a strike in the mines of Hesser & Milton. We think, under the principles before stated, that this ruling was erroneous.

It is said, however, by respondent, that this ruling was not prejudicial, even if it was erroneous, because it is said that it appears in the case that the defendant was compelled to expend, in order to fill the pump-house contract, more than $500 in excess of the contract price before the happening of the strike in Hesser & Milton's mines. If this fact did appear, it would doubtless be a complete answer to the claim of prejudicial error; but a very critical review of the bill of exceptions shows that it does not appear. The only evidence on the question is the bare statement that defendant purchased from outside parties, to fill the pump-house contract,

1,682 tons, and that this amount cost $1,009.80 in excess of the Hesser & Milton contract price. For aught that appears in the evidence, a large part or all of the excess may have been incurred for coal bought during the continuance of the strike, and, if so, then the evidence showing the meaning of the words "subject to strikes" would be manifestly very important. It is true there is a bill of particulars in the record served by the defendant in response to a demand, which purports to give dates, and prices paid for the coal so purchased, but it is not identified or verified as correct by any witness, and hence constitutes no affirmative proof of any fact as against the plaintiff.

In this state of the case it cannot be held that the ruling out of the proposed evidence as to the meaning of the strike clause was not prejudicial.

*By the Court.*—Judgment reversed, and action remanded for a new trial.